# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 21, 2010

## STATE OF TENNESSEE v. DERRICK SLOAN TAYLOR

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-D-3586      Mark J. Fishburn, Judge**

---

**No. M2009-01155-CCA-R3-CD - Filed December 14, 2010**

---

A Davidson County jury convicted the Defendant, Derrick Sloan Taylor, of attempted especially aggravated robbery and attempted first degree murder, and the trial court sentenced him to an effective sentence of thirty-three years in the Tennessee Department of Correction. On appeal, the Defendant contends that: (1) the trial court erred when it admitted evidence about him firing a gun on another occasion; and (2) the evidence is insufficient to sustain his convictions. After a thorough review of the record and applicable authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the Appellant, Derrick Sloan Taylor.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; J. Ross Dyer, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Sarah N. Davis, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the shooting of the victim, Edward Scott, on April 5, 2007, for which the Defendant was indicted on charges of attempted especially aggravated robbery and attempted first degree murder. At the Defendant's trial, the following evidence was presented: Scott testified he was working as a kitchen manager at a restaurant at the time of this shooting. On the day of this shooting, he left work at 5:30 p.m., got something to eat,

visited a gift shop, and got into his car, a white Chevrolet Tahoe, which was parked in a parking garage. Scott drove to a gas station, and, between 7:20 p.m. and 7:30 p.m., he went to a car wash because he anticipated a visit from one of the vice-presidents of his company the following day. Scott said that the vice-presidents sometimes like to go out to dinner after visiting, and he assumed he would drive, so he wanted his car to be clean.

After arriving at the car wash, Scott pulled his car next to a vacuum and began looking for money in his car to use to start the vacuum. He recalled he had with him approximately eighty dollars and that his window was down because he was smoking. A "boyish" looking black man, approximately 5'10" in height, approached him and asked for money. Scott told the man that he did not have any money, and the man, who was leaning on the outside of Scott's Tahoe at the time, brandished a black revolver from inside his coat, placed the gun inside the Tahoe, and shot Scott through the left arm. Scott put his car into drive, and the Defendant stuck the gun around on the inside of the car and shot Scott again as he said, "You should have given me the money." Scott recalled that the man also used a racial epithet.

Scott left and drove toward a hospital, and, en route, he saw a police officer, whom he flagged down. Scott told the officer he had been shot, and the officer told him to place the car into park while the officer called an ambulance, which transported Scott to Vanderbilt Hospital.

Scott explained that the initial gunshot wound severed the nerves in his arm, affecting his ability to use his hand and causing his hand to remain numb. At the time of trial, Scott still suffered from pain in his hand. He also sustained significant scarring to his arm and torso from the two gunshot wounds.

Scott said, after this shooting, he retrieved his coat from the hospital. He said, out of curiosity, he looked at the bullet holes in his coat and, while doing so, he found a bullet in his coat. He gave the bullet to the lead detective on this case, Detective Harris.

On cross-examination, Scott agreed that the day before he was shot had been a stressful day, much in part because of the impending visit from a Vice President of his company. Scott admitted that he previously had a problem with addiction but insisted he informed Detective Harris about this problem. Scott agreed that the weather was cold but not "that cold" the day he chose to wash his car. Scott said he lived in a gated community in Franklin but was shot in a poor community in East Nashville. He denied, however, going to that community for any reason other than to get his car washed. Scott agreed that he asked the detective not to inform his parents of the shooting.

On redirect examination, Scott estimated that the temperature was 45° the day of the

shooting. About his previous addiction, Scott testified he had previously been addicted to alcohol but that he had been sober for about a year-and-a-half before he was shot. He had not been drinking on the night of this incident. Scott explained that he did not want the detective telling his parents about the shooting because he was estranged from them at the time and because they were out of the country. He said he later told them himself about the shooting.

Woodrow Ledford, with the Metro Nashville Police Department, testified he was working on the evening of April 5, 2007, when he was flagged down by a man, he later learned was Edward Scott, in a white SUV who stated that he needed medical assistance. The officer told the victim, who was bloody, to remain inside his SUV until an ambulance arrived.

Felicia Evans, a crime scene investigator, testified she was dispatched to process the crime scene in this case. The shooting victim had already been transported to the hospital when she arrived at 8:00 p.m. She observed at the scene a Chevrolet Tahoe that had blood on both its interior and exterior. Officer Evans retrieved a projectile from the driver's seat and called a wrecker to take the vehicle to be processed at the lab. While processing the vehicle, the officer found two latent prints on the exterior of the passenger's side front door. She also found three latent prints on the exterior of the driver's side door.

Detective Gary Clements with the Metro Police Department testified he searched the car for evidence in this case and found nothing. He said that, had the victim been shot with a revolver, there would not have been expended shell casings at the scene.

The parties then entered the following stipulation:

On April 5th of 2007 at approximately 11:15 p.m., the defendant, Mr. Taylor fired a handgun at the location of 1008 North Second Street in Nashville, Tennessee. The projectile produced from the firing of that gun was recovered and entered into the Metro Nashville Police Department property room on Trinity Lane.

Detective Paul Harris, with the Metro Nashville Police Department, testified he was the lead detective assigned to this case. He responded immediately to the call and spoke with the officers who had spoken to the victim prior to medical transport. The detective went to the hospital, where he briefly spoke to the victim. The victim told him he had been shot during a robbery attempt at a car wash. He described the man who shot him as a black man wearing a cap and a jacket. The victim said he did not think he could identify the man. Three days after this event, Detective Harris interviewed the victim more extensively.

Before this second interview, the detective was "somewhat" concerned about the victim's story due to the lack of physical evidence: to wit, a second bullet was not recovered from the scene, and no one witnessed the shooting. After interviewing the victim a second time, his concerns were alleviated because the evidence aligned with the victim's account of the events surrounding the shooting. The detective said the victim's discovery of a second bullet inside his jacket pocket eliminated any doubt he had about the victim's story.

During the interview, the victim told the detective that he was at the car wash to vacuum his vehicle, clean out some trash, and spray it off. The detective discussed with the victim a pill bottle that police found in the victim's car. The victim explained to him that he had previously been prescribed Lortab, and the detective found the victim forthcoming.

Detective Harris testified that he determined that the high temperature on the day of this shooting was 60° and that the low was 33°. The detective further testified that the bullet police recovered from the inside of the victim's SUV was fired from the same gun that fired the bullet found in the victim's jacket. Further, both bullets were fired from the same gun that fired the bullet found where the Defendant shot a gun later in the day, about 1.7 miles from the car wash.

On cross-examination, the detective testified that the story the victim told in the two separate interviews did not match exactly. The detective agreed no physical evidence confirmed where the shooting occurred. Detective Harris agreed that, during his more extensive interview of the victim, he challenged what time the victim left work and asked why he previously said he went "straight" to the car wash from work, not mentioning that he ate dinner and went to a gift shop. The detective agreed that, after this interview, he learned that the latent palm print on the victim's car door belonged to the Defendant. The detective confirmed that, before his second interview with the victim, he suspected that this case involved a drug deal that had "gone bad."

William Stewart, a detective with the Metro Nashville Police Department, testified that he responded to a call about shots fired at 11:30 p.m. on April 5, 2007. As part of his investigation of the shots fired, he recovered a projectile and developed the Defendant as the suspect who fired those shots.

Lisa Addleman, a latent print examiner with the Metro Nashville Police Department, testified she received the latent prints in this case, which were obtained from the exterior of the door of the victim's vehicle. Addleman entered one of the latent prints into the computer system for comparison and it returned a match to the Defendant.

Patrick Ihrie, with the crime laboratory of the Tennessee Bureau of Investigations,

("TBI") testified that he performed a DNA test on the latent print involved in this case, comparing it to both the Defendant and the victim. The blood in which the Defendant's palm print was embedded belonged to the victim.

Dr. William Reardon testified that he was a trauma surgeon at Vanderbilt Hospital and that he treated the victim on April 5, 2007. The victim suffered two gunshots, one to his torso and one to his left arm. Both gunshots left an entrance and an exit wound for a total of four wounds. The gunshot to the victim's left arm severed his ulnar nerve, causing the victim permanent nerve damage.

Robert Daniel Royse, a Special Agent with the TBI, testified he was a firearms examiner, and he examined the bullets in this case. He determined that the bullet found in the victim's car was fired from the same gun that fired the bullet the victim later found in his jacket. Further, both bullets were fired from the same gun as the bullet retrieved by police during an investigation of "shots fired" by the Defendant later on the same day the victim was shot. He said the bullets were probably shot from a revolver rather than a semi-automatic rifle.

The defense recalled the victim, and the victim testified that he purchased gas and cigarettes at Citgo before going to the car wash. He said he customarily purchased gas and cigarettes from this gas station. The victim acknowledged that there was a car wash at that Citgo, but said that he preferred to go to the other car wash because it was "so much harder to get in and out of" the Citgo car wash.

Based upon this evidence, the jury convicted the Defendant of attempted especially aggravated robbery and attempted first degree murder. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it admitted evidence pursuant to Tennessee Rule of Evidence 404(b) about him firing a gun on another occasion; and (2) the evidence is insufficient to sustain his convictions.

## A. Evidence of Other Shooting

Before the trial, the State filed a notice of its intent to introduce proof that a projectile recovered from a shooting that occurred later on the same day as the shooting in this case matched projectiles found during the investigation of this shooting. The State also sought to introduce evidence, including eye witness testimony, that the Defendant was the

perpetrator of the later shooting. The Defendant filed a response in which he contended that the evidence was inadmissible pursuant to Tennessee Rule of Evidence 404(b) because the two crimes were not at all similar. Further, he contended, no evidence existed that he committed either shooting.

At a pretrial hearing, the State informed the trial court that, within hours of Edward Scott's shooting, a victim named Vincent Thomas was shot and killed. The Defendant had been charged with murder in that case. The bullet retrieved from the Thomas shooting matched bullets retrieved from the Scott shooting. The State sought to introduce evidence that both victims were shot with the same gun. Further, the State sought to introduce the testimony of a witness who would testify that he saw the Defendant shoot Thomas.

The State explained that the evidence connecting the Scott and Thomas shootings was necessary because Scott's identification of the Defendant in a photographic line-up was "very weak." After being shown multiple photographs, Scott ruled out all but two photographed men, one of whom was the Defendant. Scott could not, however, state with certainty which of the two had shot him. Further, Scott did not definitively identify the Defendant as the man who shot him at the preliminary hearing. The State said, because there was not strong evidence of identification, the evidence linking the Scott and Thomas shootings was critical to its case. The State clarified that it was not seeking to introduce that the later shooting was a homicide. It only sought to introduce that the Defendant later fired a gun, that a bullet was retrieved from that firing, and that the bullet matched those found in the Scott shooting.

The Defendant's attorney argued that Scott's shooting and Thomas's shooting were not substantially similar so as to allow evidence of one to be admitted in the trial of the other. Further, he contended that the proof that the Defendant committed the Thomas shooting was tenuous because there was only one witness and that witness was a convicted felon who had, subsequently, been incarcerated.

After the hearing, the trial court issued a written order, stating:

### ISSUE

Is the eyewitness identification of Mr. Taylor as the shooter of Mr. Thomas and the results of the analysis of the projectile recovered from the homicide scene admissible under T.R.E. 404(b) to establish the identity of Mr. Taylor as the assailant of Mr. Scott earlier on the evening of April 5, 2007?

### Conclusions of Law

T.R.E. 404 (b) generally prohibits propensity evidence in the form [of] other crimes, wrongs or acts. Although considered a rule of exclusion, T.R.E. 404 (b) does allow for the introduction of such evidence if the court finds (1) that there exists a material issue other than conduct conforming with a character trait; (2) there is clear and convincing proof of the other crime; and (3) its probative value outweighs its prejudicial effect.

As is true in all criminal cases, one of the essential elements that the State must prove beyond a reasonable doubt is the identity of the perpetrator of the alleged crime. *See State v. Taylor*, 669 S.W.2d 694, 697-98 (Tenn. Crim. App. 1983). Therefore identity is always a material issue in a criminal case. In this case, the parties agree that the identity of Mr. Taylor as the perpetrator of the crime against Mr. Scott will be a highly contested issue at the trial of this case. In *Taylor*, the Court affirmed the State's introduction of evidence of another crime committed by the defendant, which was the only evidence connecting the [d]efendant with the gun from which the fatal shots were fired in the case on trial. *Id[.]* at 698.

Mr. Scott was shown a photo lineup that included a picture of Mr. Taylor. He identified Mr. Taylor or another unknown person in the lineup as the possible perpetrator. At the preliminary hearing, Mr. Scott was unable to initially identify Mr. Taylor as the perpetrator although he assumed that he was the assailant. Later in his testimony, he seemed more positive of his identification notwithstanding that he admitted he really did not look at him when the crime occurred. There were no other eyewitnesses to the incident. The only other evidence relating solely to this crime that circumstantially places Mr. Taylor in contact with Mr. Scott is Mr. Taylor's palm print lifted from the victim's vehicle. However, the palm print does not isolate when it was placed there.

The matching tool marks of the projectiles recovered from the scene of this crime and the homicide of Vincent Thomas is the common link between these two crimes, which were committed less than five (5) hours and two (2) miles apart. This evidence establishes that the same weapon was used in both crimes. Significantly, on the issue of identity, Glen Howard testified that Mr. Taylor was the person who shot Mr. Thomas. This is the only evidence in either case that places the gun used in both crimes in the possession of Mr. Taylor.

Usually evidence of other crimes to circumstantially establish the

-7-

identify of the perpetrator requires that "evidence of the other crime supports the inference that the perpetrator of it, shown to be the defendant, is the same person who committed the offense on trial." *Bunch v. State*, 605 SW.2d 227, 231 (1980). In this case with the questionable identification of Mr. Taylor by Mr. Scott, the evidence of the identity in the other crime becomes highly relevant and would support an inference that the defendant committed the crime on trial. Further, the court finds by clear and convincing evidence that the Defendant committed the other crime. Finally, the Court does . . . find[] that the probative value of the other crime outweighs its prejudicial effect, when the testimony is limited in its scope and a contemporaneous limiting jury instruction is charged by the Court.

The trial court granted the State's motion to allow evidence of the Thomas shooting. At the Defendant's trial, the parties stipulated that the Defendant fired a gun later in the evening on the day that Scott's shooting occurred. The State then introduced evidence that bullets retrieved from the Defendant's firing of that gun matched bullets retrieved from Scott's shooting, both having been fired from the same gun.

On appeal, the Defendant contends that the trial court erred when it admitted this evidence because, he asserts, such evidence is only properly admitted when the crimes are substantially similar. Such, he says, is not the case here. Further, he asserts that the trial court improperly found that there was "clear and convincing" evidence that he committed the Thomas shooting. He states that it was "speculation" on the part of the trial court that he would be convicted of Thomas's murder; therefore, the trial court did not properly find that there was clear and convincing evidence that he had committed the Thomas shooting.

Relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 402, 403. Rule of Evidence 404 prohibits evidence of other crimes, wrongs, or acts offered to show a character trait in order to prove that a defendant acted in conformity with that character trait. Tenn. R. Evid. 404(b). The trial court may admit the evidence for non-character purposes if four conditions are met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). If a trial court "substantially complies" with these requirements, this court will review for an abuse of discretion. *State v. McCary*, 119 S.W.3d 226, 244 (Tenn. Crim. App. 2003) (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)). If the evidence sought to be admitted is relevant to an issue other than the accused's character, such as identity, motive, common scheme, intent, or rebuttal of accident or mistake, it may be admitted for that purpose so long as the danger of unfair prejudice does not outweigh the probative value. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts.; *McCary*, 119 S.W.3d at 243.

In the case under submission, we conclude the State did not introduce evidence that the Defendant fired a gun later on the same day he allegedly shot Scott to prove that the Defendant acted in conformity with a character trait involving the propensity to commit aggravated robbery or murder. The evidence was offered to show the Defendant's identity as the perpetrator of the Scott shooting. The jury heard only that the Defendant fired a gun on the evening of the Scott shooting and that projectiles retrieved from this firing matched projectiles found at the Scott shooting. Although this evidence may have implied that the Defendant behaved criminally, the State did not introduce it for this purpose, and it certainly did not conclusively prove criminal behavior on the Defendant's part, in that there was no evidence presented that the "shots fired" involved a crime. This relevant evidence, therefore, in our opinion does not constitute propensity evidence, so as to be precluded by Tennessee Rule of Evidence 404(b).

We further conclude, as did the trial court, that the probative value of the evidence to identify the victim's shooter outweighed any prejudice. *See* Tenn. R. Evid. 404(b)(4). Scott was unable to positively identify the Defendant as his shooter, although Scott did narrow down the possible suspects to being one of two men depicted in photographs shown to him by the police. There were no other witnesses to the Scott shooting. The State presented evidence at a pretrial hearing that an eyewitness saw the Defendant, with whom the witness was familiar, with a gun in his hand and saw the Defendant shoot Thomas. Thomas died as a result of this gunshot wound, and the police recovered a projectile from that shooting. The projectile matched those found in the Scott shooting. As the trial court noted, the Thomas shooting occurred five hours after the Scott shooting, and both shootings occurred within two miles of each other. This evidence, when presented to the jury, was sanitized in that the parties omitted any reference to the later "shots fired" involving a victim or even a crime.

We, therefore, conclude that the tendency of the disputed evidence to prove the Defendant's identity as Scott's shooter outweighed any unfair prejudice from the jury's possible inference that the Defendant committed another criminal act. Thus, the trial court properly allowed the State to introduce evidence of the Thomas shooting in the Defendant's trial. The Defendant is not entitled to relief on this issue.

## B. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his convictions because, he asserts, the victim's testimony was inconsistent and inaccurate. The State contends that the evidence clearly supports his convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was convicted of attempted first degree murder and attempted especially aggravated robbery, both class A felonies. First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. §§ 39-13-202(a)(1), -401(a), and -403(a) and (b) (2006). A conviction for attempted first degree murder requires proof that a defendant intended to kill the victim "after the exercise of reflection and judgment" and either the defendant intentionally engaged in the conduct constituting the offense; the defendant believed the conduct would cause the intended result without further conduct; or the conduct constituted a substantial step toward the commission of the offense. T.C.A. § 39-13-202(d) (2006); *See* T.C.A. § 39-12-202(a)(1) (2006); T.C.A. § 39-12-101 (2006). Especially aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" where the defendant uses a deadly weapon and causes seriously bodily injury to the victim. T.C.A. §§ 39-13-401(a), -403(a).

The Defendant does not contend that the State failed to meet any of the essential elements of these two crimes but, rather, focuses on inconsistencies and inaccuracies in the victim's testimony. It is the jury who is charged with making credibility determinations, not this court. *State v. Smith*, 24 S.W.3d 274, 278 (Tenn. 2000). It is not the function of this court to reweigh the credibility of witnesses on appeal. *Id.* at 278-79. The testimony was heard by the jury in this case, and defense counsel did an excellent job on cross-examination of putting any discrepancies before the jury. The jury, based upon the verdict, accredited the victim's recount of the events surrounding this shooting, a decision which we will not disturb.

### III. Conclusion

After a thorough review of the record and the applicable authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE